IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | ) |
| | )   Case No. 3:16-bk-08624 |
| WERTHAN PACKAGING, INC., | ) |
| | )   Chapter 11 |
| Debtor. | ) |
| | )   Judge Harrison |
| | ) |
| | ) |

## DECLARATION OF GARY M. MURPHEY, CHIEF RESTRUCTURING OFFICER OF WERTHAN PACKAGING, INC., IN SUPPORT OF VARIOUS FIRST DAY RELIEF

Gary M. Murphey, being duly sworn, deposes and states:

1.     I am the Chief Restructuring Officer of Werthan Packaging, Inc., a Tennessee corporation the debtor in the above-captioned chapter 11 cases ("Werthan," or the "Debtor" or "Company").  The above-captioned case is referred to as the "Chapter 11 Case."

2.     On December 4, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.     To enable the Debtor to conduct the Chapter 11 Case in as efficient manner as possible, the Debtor has requested various types of relief in certain "first day motions" (each, a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other goals, (a) establishing certain administrative procedures to facilitate a smooth transition into the Chapter 11 process; (b) ensuring the continuation of the Debtor's cash management system; (c) securing the post-petition use of cash collateral and the provision of a continuing debtor-in-possession revolver financing to the extent necessary to conduct the Chapter 11 Case; (d) providing for the post-petition payment of employee wages in the normal course of business and payroll schedule; (e) providing for the continuation of necessary utility

services to the Debtor; and (f) setting a schedule and process for the sale of substantially all of the Debtor's assets. The achievement of these goals will be critical to the success of the Chapter 11 Case and the Debtor's orderly and efficient winddown efforts.

4.      I submit this Declaration (the "<u>Declaration</u>") in support of the First Day Motions. I am familiar with the contents of each First Day Motion (including the exhibits attached thereto) and believe that the relief sought (i) is necessary to preserve the value of the Debtor's assets, (ii) is integral to the efficient winddown of the Debtor, and (iii) serves the best interests of the Debtor, the Debtor's estate, creditors and other parties-in-interest.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, materials provided by my staff, information (including regarding the Company's operations and its financial condition) provided by the Debtor, its officers and employees or information obtained from my review of relevant documents. If called upon to testify, I would competently testify to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

6.      Part I of this Declaration describes the Debtor's prepetition indebtedness, cash flow issues, investment/sale efforts and the circumstances surrounding the commencement of this Chapter 11 Case. Part II sets forth the additional specific facts in support of each of the First Day Motions.

<b><u>PART I</u></b>

**A.      <u>Werthan Packaging History</u>**

7.      Werthan has roots that go back nearly 150 years. At its height, the Company employed over 1,200 people at its long-standing home in North Nashville. Even though the Debtor has changed much over the decades, it continues to be a leading supplier in the paper packaging business.

2

8. By the early 1900s the Company became a manufacturer of textile bags, and for several years operated in the historic Marathon Motors facility. After its merger with Morgan & Hamilton Co. in 1928 the Company relocated its primary operations to its long-standing home on 8th Ave North, now known as Rosa Parks Boulevard.

9. In the 1950s the Debtor expanded into the nascent multiwall paper bag industry. A new facility was built in the heart of North Nashville at the edge of the historic Germantown neighborhood. The industrial and consumer bag industries increasingly shifted from textile bags to multiwall bags over the next twenty years. By the 1970s recognizing the increasing demands of its customers to have more complicated and sophisticated graphics as a critical means for marketing their products, Werthan invested in the a multimillion dollar, state-of-the-art printing press to penetrate further into the consumer products markets.

10. Over the next couple of decades Werthan's business experienced dramatic changes that reflected changes in consumer lifestyles and purchasing preferences. Werthan's multiwall paper bag business supplanted the textile business. The textile mill and textile bag buildings on Rosa Parks Boulevard that had been built in the last quarter of the 1800s were sold and converted into high-end condominiums by the early-2000s. Meanwhile, Werthan consolidated its operations to the buildings located behind the renovated structures where large manufacturing and residential living coexisted.

11. Werthan's business model continued to evolve and the Company made major investments in printing and bag making technology. These investments solidified its position among the most demanding consumer products companies, and allowed the business to grow within the pet products segment of the market. By 2000 the Company's packaging business had

3

shifted primarily to the pet products market, and the Company decided to focus solely on that market.

12.     Werthan had to respond to the growing demand among its customers to operate in an environment that ensures the safety of the pet food that goes into the packaging. Werthan's aging facilities could not be adapted to meet the increasingly higher standards of its customers. As a result in 2010 the Company began to move its operation to a modern 184,000 sq. ft. facility, once the home of an OshKosh B'Gosh distribution center in White House, Tennessee. The renovated facility in White House enabled the Debtor to achieve that goal. In the spring of this year it was awarded the Safe Quality Food certification, meeting the needs of its existing pet food customers, and giving it the opportunity to expand into packaging products for human food as well.

13.     The next hurdle for the Debtor was to invest in the latest printing technology. It had seen a meaningful segment of its business erode since the mid-2000s as more paper packaging for pet food transitioned to plastic bags. Also, industry standards in print quality weighed heavily on the Debtor as its printing equipment aged. New printing technology would enable the Company to enter the plastic bag market, while solidifying its position as an elite printer for paper packaging. To meet these demands, Werthan completed the installation of a new 10-color KYMC flexographic press in July of this year at Werthan's White House location. Even as the company achieved its strategic initiatives in 2016, sales have lagged projections by 25% through October. Consequently, the company has experienced significant operational losses that are putting enormous strain on the business and threatening its viability.

**B.      CRO Engagement**

14.     On September 20, 2016, the Debtor engaged me and my company, Resurgence Financial Services, LLC ("RFS"), as Chief Restructuring Officer of the Debtor (the "CRO") and

4

to assist the Debtor with possible financing sources and possibly run a sale process for assets of the Debtor.

15.    Since my engagement, I have been assisting the Debtor with cash flow issues and modeling, interaction with its prepetition lenders and trade creditors.  I have also assisted the Debtor in exploring financing alternatives and a possible sale of the Debtor's business and/or assets.

**C.    Prepetition Secured Debt**

16.    On October 14, 2015, the Company entered into a Loan and Security Agreement between the Company and VFP Asset Funding LLC ("Veritas"), pursuant to the terms of which the Company obtained an asset-based revolving line of credit (the "Veritas Loan") from Veritas in a maximum amount not to exceed the lesser of (a) $3,500,000 and (b) a borrowing base equal to the sum of (1) 85% of eligible accounts receivable and (2) 55% of eligible inventory, subject to various exclusions and reserves established by Veritas.  The Veritas Loan matures on October 14, 2018 and is secured by substantially all of the personal property of the Company and a pledge of substantially all of the equity of the Company.

17.    On October 14, 2015, the Company obtained a term loan in the principal amount of $4,650,000 (the "Newtek Loan") from Newtek Small Business Finance, LLC ("Newtek") pursuant to a promissory note made and executed by the Company and payable to the order of Newtek.  The Newtek Loan matures on October 14, 2025 and is secured by all of the Company's machinery and equipment (the "Newtek Collateral").

18.    On October 14, 2015, Veritas and Newtek entered into an Intercreditor Agreement whereby (a) Veritas subordinated its lien on the Newtek Collateral to Newtek and (b) Newtek subordinated any interest it may have in any assets of the Company other than the Newtek Collateral to Veritas.  Pursuant to this agreement, each of Newtek and Veritas agreed that it will

5

not exercise rights or remedies against the other party's priority collateral while the other party's indebtedness to the Company is outstanding. Newtek additionally agreed to give Veritas thirty (30) days to cure any default under the Newtek Loan before pursuing any rights or remedies against the Newtek priority collateral.

**D.**    **Trade Debt and Vendor Purchases and Vendor Terms**

19.    As of the Petition Date, the Debtor had outstanding unsecured trade debt of approximately $4,400,000.

20.    Vendors have been contracting terms to the Debtor and the vast majority of the Debtor's vendors and suppliers have only shipped or provided services on a cash in advance or cash on delivery basis since my engagement and even before. In order to preserve cash and maintain operations, upon my engagement the Company sought and received certain concessions from its vendors, landlords and lenders with the expectation that fourth quarter sales would rebound and the Company could develop a plan to service its debts and obligations.

21.    However, despite these concessions, during October and throughout the first half of November, sales continued to lag behind projected levels, losses continued to mount and liquidity became strained hindering the replenishment of raw materials inventory.

**E.**    **PBGC Liability**

22.    The Company has an unfunded pension plan in an amount in excess of $10 million. Prior to bankruptcy, the Company sought an early termination of its plan. No decision had been made on that request as of the Petition Date.

**F.**    **Investment/Sale Efforts and Gateway Packaging APA**

23.    Preliminary cash flow projections reflected that the Company would run out of funds in mid-November without drastic reductions in purchasing and manufacturing, thus jeopardizing the ability of the Company's ability to fulfill customer orders. The potential loss of

customer business coupled with the already low October and November sales would have a swift and deleterious impact to the Company.

24.     Given the Debtor's high debt levels, and operating losses and declining liquidity despite concessions from vendors, landlords and creditors, it was determined the most likely route to maximizing the value of the assets would be through identifying strategic buyers that needed capacity. The Debtor's president, Don Belmont, is the past chairman of the Paper Shipping Sack Manufacturing Organization (PSSMA).  Mr. Belmont was therefore knowledgeable about potential strategic investors who would have an interest in the Company. The Debtor also contacted its major customer (a Fortune 100 Company with extensive industry contacts) regarding identifying potential strategic investors.  By mid-October, the Debtor had identified likely candidates, prepared a Confidential Offering Memorandum, set up an on-line data room, and commenced contacting various strategic investors as identified by Mr. Belmont and the Debtor's major customer.  Certain potential purchasers signed mutual non-disclosure agreements, reviewed the Confidential Offering Memorandum and gained access to the online data room in October.

25.     In early November 2016, Werthan communicated with Gateway Packaging Company, LLC ("Gateway") about a potential sale of Werthan's assets.  Gateway operates in the same general business as Werthan, so Werthan believed Gateway to be a natural selection of an entity potentially interested in purchasing Werthan's asserts.  Shortly thereafter, Gateway signed a non-disclosure agreement and commenced reviewing documents in the online data room.  On November 11, 2016, Gateway and Werthan executed a letter of intent that ultimately led to Gateway's agreement to purchase substantially all of Werthan's assets pursuant to the terms of the APA (as defined below), to be accomplished in a Chapter 11 case.

## **PART II**

26.     Shortly after the filing of this Chapter 11 Case, the Debtor filed several First Day Motions. The Debtor believes, and I agree, that approval of each First Day Motion is an important element of its bankruptcy efforts and is necessary to ensure a smooth transition into an efficient Chapter 11 § 363 sale process.  I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtor's ability to achieve the most efficient § 363 sale process.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.

27.     On December 4, 2016, the Debtor and Gateway entered into a binding asset purchase agreement (the "APA") to sell substantially all of the Debtor's assets to Gateway for a purchase price of approximately $7,200,000, subject to certain price adjustments set forth in the APA.  Given the Debtor's liquidity problems and cash burn, the proposed sale to Gateway is anticipated to be on a very expedited basis

28.     In fact, the APA requires that the Sale Procedures be approved within ten (10) days and that the Sale be approved within thirty (30) after the Petition Date.  Because of the high debt and losses in the Debtor's business (as described above) and because of the Buyer's concern over the erosion of the Debtor's business, the APA requires that the Sale Procedures be approved promptly, and that the sale be closed within forty (40) days after the Petition Date.  The Sale simply cannot be closed in that time frame without expeditious approval of the Sale Procedures. If the Sale cannot be consummated within the APA's required time frame, there is little chance that the Debtor's business would survive, to the detriment of the Debtor's employees, vendors, customers, and creditors.  Thus, in my opinion, expedited approval of the Sale Procedures, and

8

approval of the Sale within the next thirty (30) days, is in the best interests of the Debtor and its estate.

**A.**     **Motion of Debtor for Order Pursuant To 11 U.S.C. Section 105(a), 363, 364, And 503(b)(1) And Fed. R. Bankr. P. 6003 Authorizing Continued Maintenance of Existing Bank Accounts, and Authorizing Continued Use of Existing Business Forms and Checks (the "Cash Management Motion")**

29.     Prior to the commencement of this Chapter 11 Case, in the ordinary course of its business, the Debtor maintained seven (7) bank accounts out of which it manages cash receipts and disbursements (the "Bank Accounts").  The Debtor's banking accounts relationships are with Regions Bank, Bank of America, First Republic and Wells Fargo.  A list of the Bank Accounts follows:

| | ACCOUNT NAME | LAST 4 digits of Account Number | Purpose | Bank |
|---|---|---|---|---|
| 1. | Operating Account | 5444 | Funding | Regions |
| 2. | Disbursement Account | 0243 | Payables | Regions |
| 3. | Payroll Account | 3204 | Payroll Fund | Regions |
| 4. | Press/Construction Account | 1236 | Construction | Regions |
| 5. | Short Term Disability Account | 8123 | Employee Disability Payments | Bank of America |
| 6. | Veritas Collateral Account | 8536 | Veritas Cash Collateral | First Republic |
| 7. | Lockbox Account | 8339 | Lockbox Collections | Wells Fargo |

The Debtor believes that the Bank Accounts are maintained with financially stable banking institutions with FDIC insurance (up to the applicable limit).  There is only one account—the Operating Account—under the Company's control that may,  for a short time, exceed the FDIC insurance limitation (which Veritas funds weekly and then from which disbursements are then made).  The Veritas Collateral Account is not under the control of the Company and provides additional collateral for the Veritas debt.

9

30.     The Debtor seeks a waiver of the U.S. Trustee's requirement that the prepetition Bank Accounts be closed and that new postpetition bank accounts be opened.  If enforced in this case, such a requirement would cause disruption in collection of accounts receivable and would impair the Debtor's efforts to maximize the value of its estate.

31.     Accordingly, in order to ensure a smooth transition into Chapter 11 with minimal disruption, and to aid in the Debtor's efforts to complete the proposed sale successfully and rapidly, the Debtor must be permitted to continue to maintain its existing Bank Accounts.

32.     In addition, in order to minimize expenses to its estate, the Debtor also seeks authorization to continue using all business forms and checks existing immediately prior to the Petition Date, without reference to the Debtor's status as a debtor-in-possession.

33.     Changing business forms and checks would be expensive, unnecessary, and burdensome to the Debtor's estates.  Furthermore, doing so would not confer any benefit upon those dealing with the Debtor, because each of the Debtor's vendors will receive direct notice of the commencement of the respective Chapter 11 Cases.  For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to place the label "Debtor-In-Possession" on each.

**B.     Motion of Debtor for Interim and Final Orders (1) Authorizing Debtor To Obtain Postpetition Financing Pursuant To Bankruptcy Code Section 364, (2) Granting Senior Liens And Superpriority Administrative Expense Status, (3) Authorizing Use Of Cash Collateral And Providing Adequate Protection, (4) Modifying The Automatic Stay, (5) Setting Expedited Interim Hearing, And (6) Prescribing Form And Manner Of Notice And Time For Final Hearing (the "DIP Financing and Cash Collateral Motion").**

34.     The Debtor seeks authority to obtain postpetition financing under section 364 of the Bankruptcy Code from Veritas under substantially the same terms as the Veritas Credit Agreement, as described in the DIP Financing and Cash Collateral Motion, including authority to use Cash Collateral.

10

35.     The Debtor is presently unable to obtain unsecured credit (allowable under

Section 503(b)(1) of the Bankruptcy Code as an administrative expense) pursuant to Section

364(a) and (b) of the Bankruptcy Code in an amount necessary for the maintenance and

preservation of the Debtor's estate.  The Debtor has not been able to obtain financing on terms

and conditions more favorable to the estate than those offered by Veritas under the Veritas Credit

Agreement and Interim Order.

36.     Specifically, the Debtor is requesting entry of interim and final orders authorizing

the Debtor to:

> (a)     obtain postpetition financing as described more particularly in the Interim
>         Order;
>
> (b)     use Cash Collateral in the Specified Period in the amounts and for the
>         purposes set forth in the Budget attached as <u>Exhibit 1</u> to the Interim Order,
>         subject to the terms of the Interim Order;
>
> (c)     grant the Veritas and Newtek the Senior Adequate Protection Liens and the
>         Senior Adequate Protection Superpriority Claim to the extent of any
>         diminution in value of their respective interests in the PrePetition
>         Collateral, and for the imposition of the automatic stay;
>
> (d)     vacate and modify the automatic stay imposed by section 362 of the
>         Bankruptcy Code to the extent necessary to implement and effectuate the
>         terms and provisions of the Interim Order;
>
> (e)     schedule a final hearing (the "<u>Final Hearing</u>") to consider entry of an order
>         (the "<u>Final Order</u>") granting the relief requested herein on a final basis and
>         approve the form and notice with respect to the Final Hearing;
>
> (f)     waive any applicable stay and provide for immediate effectiveness of the
>         Interim Order; and
>
> (g)     provide a "carve-out" for professional fees, as more specifically set forth
>         below.

37.     The Debtor requests that the duration of the Interim Order be five (5) weeks.  The

Interim Order reaffirms the terms of the Veritas Credit Agreement for the Debtor, allowing the

Debtor to access the full amount of the Veritas Credit Agreement to assist the Debtor's ongoing operations.  The key terms of the Veritas Credit Agreement are described above.

38.     The best interests of the Debtor's estate are served by the Court authorizing the Debtor to borrow funds from the Veritas and to provide the Prepetition Lenders with liens and security interests, subject to the terms of the Interim Order.  Pursuant to the Interim Order, the Prepetition Lenders are not obtaining a "priming" lien upon any property encumbered by a properly perfected, valid, prepetition lien or security interest existing as of the Petition Date other than liens securing the Prepetition Obligations.

39.     The Debtor requests entry of the Interim Order as soon as possible.  Because of the high debt and losses in the Debtor's business (as detailed above) and because of the Buyer's concern over the erosion of the Debtor's business, the APA requires that the Sale be closed by January 15, 2017.  The Debtor will be unable to operate in Chapter 11 and consummate the Sale unless the Court enters the Interim Order promptly to provide interim debtor in possession financing and use of Cash Collateral.  If the Sale cannot be consummated within the APA's required time frame, there is little chance that the Debtor's business would survive, to the detriment of the Debtor's employees, vendors, customers, and creditors.  Thus, expedited approval of the DIP Loan and use of Cash Collateral is in the best interests of the Debtor and its estate.

40.     The Debtor requires postpetition financing and the use of Cash Collateral to pay certain expenses as reflected in the Budget. Collections on accounts receivables and advances under the Veritas revolver are the Debtor's only source of funds with which to pay expenses and are subject to the liens of the Prepetition Lenders as described above.  Therefore, the Debtor's ability to re-borrow under the terms of the Veritas Credit Agreement and use Cash Collateral to

pay budgeted expenses is essential to the success of the Sale and of this Chapter 11 Case. Unless the Court authorizes the use of Cash Collateral, the Debtor will be unable to pay for goods and services and pay expenses necessary to preserve and maximize the value of its assets. Thus, authorization of postpetition financing and to use Cash Collateral, pending the Final Hearing, is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

41.    As reflected in the Debtor's budget, the Debtor needs the liquidity from the use of the Cash Collateral and the DIP Loan in order to conduct post-petition operations in a manner that would allow the Debtor to consummate the proposed sale of substantially all of its assets.

**C.    Motion of the Debtor for an Order (A) Authorizing the Debtor to Pay Certain Prepetition (i) Wages and Salaries, (ii) Reimbursable Employee Expenses, and (iii) Employee Medical And Similar Benefits and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Employee Wage Motion").**

42.    In the Employee Wage Motion, the Debtor seeks authority to pay and honor, in the ordinary course of business, prepetition and postpetition claims and obligations related to (a) Unpaid Compensation and Severance Payments, (b) Deductions and Payroll Taxes, (c) Reimbursable Expenses, and (d) the Employee Benefit Programs, all as defined and described in more detail in the Employee Wage Motion.

43.    In addition, the Debtor is requesting that banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtor is also requesting that all such banks and financial institutions be authorized to rely on the Debtor's designation of any particular check or electronic payment request as appropriate pursuant to this Motion.

44.     The Debtor seeks this authorization because the employees are essential to the continued operation of the Debtor's business and, absent an order granting the relief requested by this Motion, the employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations. Moreover, the Debtor believes that, without the requested relief, the continued operation of the Debtor's business will be undermined, value to the estate will be irreparably harmed, and the success of the Sale will be threatened. The commencement of this Chapter 11 Case will likely create employee anxiety, and the requested relief is critical to stabilizing these concerns.

### The Debtor's Employees

45.     As of the Petition Date, the Debtor employs approximately 89 employees ("Employees").  Approximately 66 Employees are paid hourly (the "Hourly Employees") and approximately 23 are on salary (the "Salaried Employees").  From time to time, the Debtor also employs temporary employees (the "Temporary Employees") through various temporary agency services.  As of the Petition Date, the Debtor employs approximately 10 Temporary Employees.

46.     The Employees perform a variety of critical functions, including without limitation, administration, sales, manufacturing, maintenance, repair and other tasks.  The Employees' skills and their knowledge and understanding of the Debtor's operations, customer relations and infrastructure are essential to the effective operation of the Debtor's business.

47.     To minimize the personal hardship that the Employees would suffer if prepetition employee-related obligations are not paid when due or as expected and maintain morale and stability in the Debtor's workforce during this critical time, the Debtor, by this Motion, seeks authority to pay and honor certain prepetition claims for, among other amounts, wages, salaries, bonuses and other compensation, severance payments, federal and state withholding taxes and

14

other amounts withheld (including, garnishments, employees' share of insurance premiums, taxes and 401(k) contributions), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage and all other benefits that the Debtor has historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Wages and Benefits") and to pay all costs incident to the foregoing.  The Debtor also seeks authority to continue all Employee Wages and Benefits post-petition.  In addition, the Debtor requests the right to modify, change and discontinue any of the Employee Wages and Benefits, and the policy related to reimbursable expenses, and to implement new Employee Wages and Benefits in the ordinary course of business during this Chapter 11 Case without the need for further Court approval, so long as such action does not materially increase any Employee Wages and Benefits.

Employee Obligations

a.      Unpaid Compensation

48.      In the ordinary course of business, the Debtor incurs payroll obligations to the Employees.  Such obligations are generally comprised of wages and salaries.  Hourly Employees are paid each Thursday, and Salaried Employees are paid semimonthly on the 15th and the last day of the month.

49.      All payrolls are funded approximately one business day prior to the payment date by transferring the required funds to the Regions Payroll Account (the "Payroll Account") as directed by Pay Focus ("Payroll Servicer"), which provides the payroll outsource services for the Debtor.  One day prior to payment date, Payroll Servicer initiates ACH for payroll taxes and Employee Direct Deposits.

50. On November 29, 2016, the Debtor transferred to the Payroll Account $73,462.19 for the Salaried Employee payroll that was paid on November 30, 2016 (which includes $19,798.43for taxes and other withholdings). On November 30, 2016, the Debtor transferred to the Payroll Account $34,910.37 for the Hourly Employee payroll that was paid on December 1, 2016 (which includes $9,076.63 for taxes and other withholdings).

51. Because all of the Employees are paid in arrears, as of the Petition Date, Employees have not been paid all of their prepetition wages (the "Unpaid Compensation"). For example, the Employees will have accrued wages and benefits that were not included in the prepetition payroll but would be included in the Hourly Employee payroll due on December 8 and the Salaried Employee payroll due on December 15, 2016. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid, and (b) some payroll checks issued to Employees on or prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. Further, Temporary Employees may be entitled to compensation based upon the invoices submitted to the Debtor from the various temporary employment agencies. Further, some employees may be entitled to expense reimbursements on account of prepetition expenditures.

52. The Debtor asserts that, as of the Petition Date, no Employee is owed more than $12,850.00 for Unpaid Compensation or other benefits.

b. Deductions and Withholdings

53. During each applicable pay period, the Debtor routinely deducts certain amounts from paychecks, including, without limitation, (a) garnishments, child support and similar deductions and (b) other pretax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits

16

and insurance premiums, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "Deductions").   The Debtor or Payroll Servicer forwards the amount of the Deductions to the appropriate third-party recipients.  On average, during each biweekly and semimonthly salary pay period (which would include one payroll for Salaried Employees and two payrolls for Hourly Employees) approximately $24,500.00 is deducted from payroll for the benefit of Employees.  Certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtor seeks authority to continue to forward all prepetition and post-petition Deductions to the applicable third-party recipients.

54.     Further, the Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts").  The Debtor must then match from its own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  Prior to the Petition Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Payroll Taxes and all such amounts have been remitted to the appropriate taxing authorities.  The Debtor pays approximately $40,000.00 each bi-weekly hourly and semimonthly salary pay period on account of Payroll Taxes.  Accordingly, the Debtor seeks authority to continue to honor and process all prepetition and postpetition payments for Payroll Taxes.

c.     Honoring Checks for, and Payment of, Reimbursable Expenses

55.     Prior to the Petition Date, the Debtor reimbursed Employees for certain expenses incurred on behalf of the Debtor in the scope of their employment (the "Reimbursable

17

Expenses"). The Reimbursable Expenses include, without limitation, certain travel expenses and expenses for maintaining cellular telephones that are used in the scope of employment.

56.     The Reimbursable Expenses were all incurred on the Debtor's behalf and with the understanding that they would be reimbursed. Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses, the Debtor requests authority to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, (b) modify its prepetition policies relating thereto as it deems appropriate, and (c) pay all Reimbursable Expenses that (i) accrued prepetition and (ii) accrue postpetition but relate to the prepetition period.

d.     Employee Benefits

(i)     Medical, Prescription Drugs, Dental/Vision and Flexible Spending Plans

57.     The Debtor offers its Employees the ability to participate in a number of insurance and benefits programs, including health care and dental plans, vacation time and other paid leaves of absence, retirement savings plans, and the other insurance plans more particularly described herein (collectively, the "Employee Benefits Plan").

58.     The Debtor's group health plan is through United Healthcare (the "Medical Plan"). The Debtor and Employees share the costs of premiums for the Medical Plan. The Debtor's monthly share of Medical Plan premiums is approximately $20,200.00.

59.     The Debtor provides employer-paid $100,000 group travel life insurance for each employee. The Debtor pays approximately $900.00 per year for this benefit.

60.     The Debtor provides an Accident and Sickness short term policy available to Hourly Employees. This is a self-insured plan that will provide up to 13 weeks of pay to Hourly Employees who elect and pay for this benefit. The Debtor pays approximately $1,200 per month for this benefit.

61. Other benefits that are available to the Employees through various providers on an employee-paid basis are dental and vision insurance, term life insurance, universal life insurance, dependent life insurance, short-term disability insurance, accidental death insurance, cancer insurance, accident insurance, long-term disability, and critical illness insurance.

62. Prior to the Petition Date, the Debtor may have incurred certain administrative obligations to the third party administrators, which have not yet been paid.

63. The Debtor provides Employees who participate in the Medical Plan primary life insurance coverage and primary accidental death and dismemberment insurance through Boston Mutual (the "Life and AD&D Insurance"). This coverage costs the Debtor approximately $250.00 per month. By this Motion, the Debtor seeks authority to continue making the above-described contributions for the Life and AD&D Insurance and pay any amounts related thereto, including on account of any premiums and claim amounts, to the extent that they remain unpaid on the Petition Date.

64. The Debtor also provides its employees with an employee assistance program "EAP," which costs the Debtor less than $200 per month.

65. By this Motion, the Debtor seeks authority to (a) continue the Medical Plan, Term Life and AD&D Insurance, group travel life, EAP, and all employee paid plans in the ordinary course of business, (b) continue making the above-described contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums and claim amounts, to the extent that they remain unpaid as of the Petition Date.

e.    Workers' Compensation

66. Prior to the Petition Date, the Debtor provided workers' compensation insurance for its Employees at the statutorily-required level (the "Workers' Compensation Program"). These benefits are currently provided for Employees with coverage through Accident Fund,

19

which provides full coverage for all workers compensation claims. The Debtor pays approximately $7,845 per month for this coverage.

67. Certain benefits and obligations under the Workers' Compensation Program have been incurred prepetition but have yet to be fully paid, and certain other claims were filed prepetition but have yet to be resolved. By this Motion, the Debtor requests authority to continue and maintain its Workers' Compensation Program in the ordinary course of business and to pay any and all prepetition and postpetition amounts related thereto including, without limitation, any payments for workers' compensation claims, premiums and fees owed for administrative costs and other amounts required in connection with the Workers' Compensation Program, as such amounts become due in the ordinary course of the Debtor's business.

f.   Paid Time Off and Other Leaves of Absence

68. The Debtor provides its Employees with a paid time-off benefit that allows the Employee to take time off from work for vacation, illness, or personal time with pay ("PTO"). The amount of PTO available to a particular Employee and the rate at which such PTO accrues is generally determined by the Employee's position and the length of full-time employment. When an Employee elects to take PTO, the Employee is paid his or her regular hourly or salaried rate. Employees may carryover up to 40 hours of unused PTO from one year to the next. Any hours in excess of 40 remaining with the Salaried Employees on December 31 and Hourly Employees on June 15 of the given year will be forfeited without management approval. Employees may not be paid in lieu of using their PTO. Employees who voluntarily cease their employment with the Debtor, provide two weeks' notice, and work through the two week notice period, are eligible to be paid for PTO hours they have accumulated up to the last day worked.

69.     In addition, in the ordinary course of business, the Debtor allows its Employees to take certain other leaves of absence which are required by law, such as under the Family Medical Leave Act and Americans with Disabilities Act ("Leaves of Absence").

70.     By this Motion, the Debtor requests that it be authorized to continue to honor its PTO and Leaves of Absence policies in the ordinary course of business, up to the closing of the proposed Sale, but not after and to honor and pay any prepetition amounts related thereto.  In this regard, even in the event Employees utilize accrued prepetition PTO and Leaves of Absence in the ordinary course of business, those events will not create any material cash flow requirements beyond the Debtor's normal payroll obligations.

g.     Employee Savings and Retirement Plans

71.     The Debtor maintains a retirement savings plan meeting the requirements of Section 401(k) of the Internal Revenue Code for the benefit of certain Employees (the "401(k) Plan") that is administered by The Retirement Plan Company.  The 401(k) Plan allows for automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code.  Employees become eligible to contribute to the 401(k) Plan the first of the month after 90 days of service with the Debtor (the "Participants").  Entry dates to participate in the 401K Plan are January 1, April 1, July 1 and October 1 or each year.  The Debtor provides a 50% match of Employee contributions up to 6% of the Employee's compensation.  The Debtor estimates that matching contributions under the 401(k) Plan cost approximately $2,200.00 per month and is paid on a per pay period basis.

72.     By this Motion, the Debtor seeks authority, to pay any prepetition and post-petition matching contributions due and owing under the 401(k) Plan.

h.     Life and AD&D Insurance

21

73.     The Debtor provides Employees who participate in the Medical Plan primary life insurance coverage and primary accidental death and dismemberment insurance through Boston Mutual (the "Life and AD&D Insurance"). This coverage costs the Debtor approximately $250.00 per month.

74.     Paying prepetition employee benefits and wages will benefit the Debtor's estate and its creditors by allowing the Debtor's business operations to continue without interruption. Indeed, the Debtor asserts that without the requested relief, its Employees may seek alternative employment opportunities, perhaps with the Debtor's competitors. Such a development would deplete the Debtor's workforce, hindering the Debtor's ability to continue to operate its business, which could negatively affect the Debtor's business value and potentially affect the Sale. The loss of valuable Employees would be distracting at this critical time. Accordingly, the Debtor must do its utmost to retain its workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee Wages and Benefits that accrued prepetition.

**D.      Motion by Debtor Pursuant To 11 U.S.C. §§ 363(B), (F), (K), And (M), and 365 and Fed. R. Bankr. P. 2002, 6004, And 6006, to (A) Approve the Sale Transaction Pursuant to the Asset Purchase Agreement with Gateway Packaging Company, LLC, Free and Clear of Claims, Liens, Encumbrances, and Other Interests; (B) Approve the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approve Procedures to Establish Certain Cure Amounts for Executory Contracts and Unexpired Leases to be Assumed under the APA; (D) Approve Sale and Bidding Procedures; and (E) Schedule a Sale Approval Hearing (the "Sale Motion").[1]**

75.     In the Sale Motion, the Debtor seeks entry of two related orders. First, the Debtor requests the expedited entry of an order (the "Sale Procedures Order"), pursuant to 11 U.S.C. §§ 363 and FED.R.BANKR.P. 2002 and 6004, (i) authorizing and approving certain proposed

---

[1] Capitalized but undefined terms in this section shall have the meanings ascribed to them in the Sale Motion.

procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtor's assets and the form and manner of notices of (a) the hearing to consider authorization and approval of the sale, and (b) the assumption and assignment of executory contracts and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") pursuant to 11 U.S.C. § 365; and (ii) setting a hearing to consider the sale on December ___, 2016. Second, the Debtor is requesting entry of an order (the "Sale Order"), pursuant to 11 U.S.C. §§ 363(b), (f), and (m), and 365 and FED.R.BANKR.P. 6004 and 6006, authorizing and approving, among other things, (i) the sale of the Debtor's assets pursuant to the APA between the Debtor and Gateway free and clear of liens, claims, encumbrances, and other interests (the "Sale"), and (ii) the assumption and assignment of certain executory contracts and Leases of the Debtor.

The Asset Purchase Agreement

76.     Subject to approval and the submission of any higher or better offers, the Debtor has reached an agreement with Gateway  as embodied in the proposed APA (the "Stalking Horse Bid"). The APA is the result of extensive, arm's-length negotiations between the Debtor and Gateway.

77.     The Sale, as embodied in the APA, contemplates that substantially all of the Debtor's assets (the "Purchased Assets"), will be sold and transferred to Gateway, and that certain liabilities of the Debtor (the "Assumed Liabilities") will be assumed by Gateway. Assets excluded from the Sale, which are defined in the APA, will be administered in the Chapter 11 case.

23

78.     The purchase price for the Purchased Assets is equal to the sum of approximately

$7,000,000.00 cash, subject to certain reductions or increases based on the value of "Net

Working Capital Assets" and certain other pro-rations.

Proposed Sale Procedures and Notice

79.     The sale of the Purchased Assets pursuant to the APA is subject to higher or better

offers.  The APA provides certain terms and procedures (collectively, the "Sale Procedures"), to

govern the submission of any competing offers based upon the APA.

80.     The Debtor also proposes pursuant to Bankruptcy Rule 2003(d) and 2002(1), that

publication of the Sale Notice (the "Publication Notice"), on or before December 12, 2016 (the

"Mailing Deadline") or as soon as practicable thereafter (i) once in: *The Daily Ledger*, and on the

website and in any trade publication of the Paper Shipping Sack Manufacturers' Association, Inc.

(the trade association for the Debtor's industry), be deemed proper notice to any other interested

parties whose identities are unknown to the Debtor.

81.     The Debtor submits that good and sufficient cause exists to approve the Sale

Procedures.  The Sale Procedures are in the best interests of the Debtor and its economic

stakeholders and other parties because they will enable the Debtor to realize the maximum value

from the sale of the Purchased Assets.  Additionally, the Sale Procedures include appropriate

noticing procedures to ensure all parties in interest will receive adequate notice of all relevant

information.

82.     The expeditious nature of the proposed Sale Procedures is reasonable and

justified.  The Sale Procedures will provide an additional procedural safeguard and market check

that will enable any potentially qualified interested parties with an opportunity to come forward

and make a competitive bid.

83.     The Debtor requests the Sale Procedures be approved within ten (10) days and

that the Sale be approved within thirty (30) after the Petition Date.  Because of the high debt and

losses in the Debtor's business and because of the Buyer's concern over the erosion of the

Debtor's business, the Sale on the proposed timeline is the only reasonable chance to maximize

the value of the Debtor's assets for the benefit of creditors and the only potential for the Debtor's

employees to have ongoing employment.  Moreover, in order to prevent a substantial

deterioration of the Debtor's assets and business, the Sale must be accomplished within this short

time.  The Sale simply cannot be closed in that time frame without expeditious approval of the

Sale Procedures.  If the Sale cannot be consummated within the APA's required time frame, there

is little chance that the Debtor's business would survive, to the detriment of the Debtor's

employees, vendors, customers, and creditors.  Thus expedited approval of the Sale Procedures,

and approval of the Sale within the next thirty (30) days, is in the best interests of the Debtor and

its estate.

84.     The Sale Procedures are reasonable.  For example, there are detailed requirements

for qualified bids and there is a defined minimum overbid to ensure that bidding will benefit the

Debtor's estate.  Also, the proposed break-up fee of $215,000 represents less than 3.0% of the

aggregate purchase price and the Expense Reimbursement of up to $200,000 is also reasonable

given the size and complexity of this deal

85.     The Sale Procedures are also necessary to induce Gateway to provide the Stalking

Horse Bid, and therefore, the Debtor to obtain the numerous benefits of the Stalking Horse Bid.

Gateway was unwilling to enter into the APA without the inducement of the Break-up Fee and

the Expense Reimbursement.  Without Gateway as the stalking horse bidder, the Debtor would

not have the certainty of a minimum price for the Purchased Assets and, thus, the Expense Reimbursement and the Break-up Fee preserve the value of the Debtor's estate.

86.     Gateway has proceeded in reliance upon the agreement by the Debtor to seek the Sale Procedures and in reasonable expectation that this Court would enter an order providing such relief.  The Debtor submits that the Sale Procedures are a normal and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular, protections such as the break-up fee and the Expense Reimbursement encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.

87.     The Publication Notice, the Sale Notice, the Assumption and Assignment Notice, and the method of service described herein and provided in the Sale Procedures Order, fully comply with Bankruptcy Rule 2002 and constitute good and sufficient notice of the Sale Procedures, the Bid Deadline, the 363 Transaction, the assumption and assignment of executory contracts and Leases, the relevant objection deadlines, the Sale Hearing, and all matters related thereto.

<u>Sale of the Purchased Assets</u>

88.     The Debtor has determined that a sale process of the Purchased Assets in accordance with the proposed Sale Procedures will enable it to obtain the highest or best offer for the Purchased Assets, thereby maximizing the value of assets, and is in the best interests of the Debtor and its creditors and other stakeholders.  The Sale Motion requests approval of a sale transaction that embodies the objective of the Debtor to implement the only available means to

maximize the value of the Debtor's business and, by extension, potentially preserve jobs for the Debtor's employees through an immediate sale.

89.     To maximize the value of the Debtor's assets and instill confidence on the part of consumers, employees, suppliers, and other stakeholders that the business will effectively continue, the proposed sale of substantially all of the Debtor's assets to Gateway under 11 U.S.C. § 363 must be expeditiously pursued and approved.  Implementation of the sale will best serve the interests of the Debtor's economic stakeholders, as the only other alternative will result in little or no recoveries from the Debtor's assets as well as severe economic consequences for its employees, suppliers, and their communities.

90.     I, and the Debtor, in the exercise of sound business judgment, have concluded that the Sale is the only means of preserving value and continuing the business for the benefit of all economic stakeholders.  A long Chapter 11 or restructuring for the Debtor is not an option. No long term debtor-in-possession financing is available to the Debtor.

91.     As described above, the Debtor in working with me, concluded that the most likely route to maximizing the value of the assets would be through identifying strategic buyers that needed capacity.  The Debtor's president, Don Belmont, is the past chairman of the Paper Shipping Sack Manufacturing Organization (PSSMA).  Mr. Belmont was therefore knowledgeable about potential strategic investors who would have an interest in the Company. The Debtor also contacted its major customer (a Fortune 100 company with extensive industry contacts) regarding identifying potential strategic investors.  By mid-October, the Debtor had identified likely candidates, prepared a Confidential Offering Memorandum, set up an on-line data room, and commenced contacting various strategic investors as identified by Mr. Belmont and the Debtor's major customer.  Certain potential purchasers signed mutual non-disclosure

agreements, reviewed the Confidential Offering Memorandum and gained access to the online

data room in October. Ultimately, Gateway submitted its letter of intent, and in the course of the

subsequent negotiations, the Debtor concluded that the 363 Transaction is the only realistic way

for the Debtor's assets to retain going concern value, provide potential employment

opportunities, and continue business in the interests of all stakeholders. The Debtor and I do not

believe that there is any viable alternative to the proposed 363 Transaction. The 363 Transaction

is, in the Debtor's business judgment, the most realistic way for the Debtor to provide its

employees and vendors with an opportunity to have an ongoing business.

      92.     Any order approving the sale of the Purchased Assets in accordance with the Sale

Procedures must be effective immediately upon entry of such order by providing that the

fourteen-day stay shall not apply. As described above, absent a prompt approval and

consummation of the 363 Transaction, the Purchased Assets will rapidly decline in value as

wasting assets. Therefore, it is imperative that the Sale Order be effective immediately to permit

the 363 Transaction to close without any delay. The fourteen-day stay under Bankruptcy Rule

6004(h) should be waived. Likewise, any order approving the sale of the Purchased Assets,

which includes approving the assumption and assignment of the Assumable Executory Contracts

to the Successful Bidder, must be effective immediately upon entry of such order by providing

that the fourteen-day stay shall not apply. The exigent circumstances necessitating the prompt

consummation of the 363 Transaction mandates that the Sale Order, the assumption and

assignment of the Assumable Executory Contracts to the Successful Bidder be effective

immediately upon entry. The fourteen-day stay under Bankruptcy Rule 6006(d) should be

waived.

**E.** **Motion for an Order Pursuant to Bankruptcy Code Sections 105(A) and 366 (i) Approving Debtor's Adequate Assurance of Payment, (ii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, and (iii) Scheduling a Hearing with Respect to Contested Adequate Assurance of Payment Requests (the "Utility Motion")**

93.     On average, the Debtor spends approximately $53,000 per month in the aggregate for various utility services (the "Utility Services").  These Utility Services are provided by approximately 8 utility providers (the "Utilities").  The Debtor's operations necessarily depend on a number of different kinds of Utility Services, including, among others, electricity, water, sewer service, gas, local and long-distance telephone service, internet service, waste disposal, and other similar services.  The Debtor cannot operate without the Utility Services provided by the Utilities, and any disruption, particularly in the Debtor's waste disposal, water, gas, electricity, and telephone services could cause significant damage to the Debtor's ongoing business operations.  For these reasons, the Debtor must ensure the continued provision of Utility Services.

94.     The Debtor has a strong payment history with its Utilities with few, if any, significant defaults or arrearages on any of the Debtor's undisputed utility service invoices, other than potential payment interruptions caused by the commencement of the Debtor's Chapter 11 Case.  The largest single monthly Utility payment is for the Debtor's electric service in the White House Facility, and that utility provider (CEMC) holds a prepetition deposit in the approximate amount of $21,000.

95.     The Debtor intends to pay when due all undisputed postpetition charges for Utility Services.  The Debtor's available cash will be more than sufficient to pay for the Debtor's postpetition Utility Services.

96.     Nevertheless, in accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtor proposes to provide adequate assurance of payment by depositing, for the benefit of

29

the Utilities, a sum equal to two weeks of the Debtor's estimated monthly utility consumption, calculated as a historical average over the past twelve months and reduced by the amount of any prepetition deposits held by any of the Utilities (the "Adequate Assurance Deposit"), into a newly created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within twenty (20) days after the Petition Date.  The estimated amount of the Adequate Assurance Deposit is $16,000.00, which can be increased pursuant to the procedures proposed in the Utility Motion.

97.     The Debtor believes that the Adequate Assurance Deposit Account and the Debtor's ready access to sufficient funds to pay for postpetition Utility Services constitute sufficient Adequate Assurance for the Utilities.

**F.**     **Motion for Employment of and Assumption of Prepetition Agreement with Resurgence Financial Services, LLC and Gary Murphey as Chief Restructuring Officer**

98.     Prior to the Petition Date, the Debtor entered into an agreement for the services of me and RFS as CRO (the "Agreement").

99.     By this Motion, the Debtor seeks the authority to assume the Agreement pursuant to 11 U.S.C. §365.  In addition, out of an abundance of caution, the Debtor seeks to retain us as CRO under Sections 327 and 328 of the Bankruptcy Code.

100.     I and RFS have been assisting the Debtor on a nearly day to day basis since their engagement.  We have been a critical communication point with secured lenders, vendors and Gateway.  I have also been running the sale process and continue to do so through the sale hearing and the sale's closing.

101.     In exchange for our services, the Debtor will compensate RFS $350 per hour for my time and $200 per hour for my staff's time. The Debtor will also reimburse RFS for any ordinary expenses, as set forth more fully in the Agreement.  Additionally, as provided for in the

Agreement, RFS will be paid a transaction fee for the proposed asset sale.  That fee is calculated as follows:  (8) 5% of first $1 million, (ii) 4% of second $1 million, (iii) 3% of the third $1 million and (iv) 2% of proceeds thereafter.  The Debtor paid an initial retainer to RFS in the amount of $25,000, which will be applied to RFS's final invoice.

102.    To the best of the Debtor's knowledge, based on the information provided by RFS and subject to RFS's continuing review: (a) RFS and I neither hold nor represent any interest adverse to the Debtor's estate; (b) RFS and I are "disinterested persons" within the meaning of Sections 101(14) and 327(a) of the Bankruptcy Code; and (c) except for the Agreement, RFS and I have had no affiliation with the Debtor, its creditors or any party in interest, or their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

103.    For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate, is in the Debtor's sound business judgment, and is in the best interest of its estate.

104.    In determining to assume the Agreement, the Debtor clearly has satisfied the requisite "business judgment" standard.  As stated above, assumption of the Agreement is necessary for the Debtor to continue uninterrupted operation of its business and proceed through a sale and conclusion of these cases.  Assumption of the Agreement is in the best interest of the Debtor's estate, its creditors, and other parties in interest, and the Court should approve the Debtor's assumption of the Agreement.

105.    In addition, out of an abundance of caution, the Debtor seeks approval for the services of the CRO under Section 327 and 328 of the Bankruptcy Code.  Section 327 provides that a Debtor in Possession, with court approval "may employ one or more … professional

persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons…." 11 U.S.C. § 327(a). Section 328 allows a Debtor in Possession to employ a professional under section 327 "on any reasonable terms." 11 U.S.C. § 328(a).

106. As described above, the CRO does not hold an interest adverse to the Debtor's estate, and the CRO is a "disinterested person" as defined in the Bankruptcy Code. And, for all the reasons stated above, the CRO's employment is necessary for the Debtor's estate. It is also significant that the CRO will <u>not</u> be essentially serving in the capacity of a trustee or examiner. This is <u>not</u> a case involving incompetent or corrupt management, but rather a situation where the Debtor requires the expertise that the CRO can provide both in running the business and the sale process. Moreover, the terms of the Agreement are reasonable, including the hourly fees and the Transaction Fee described in the Agreement. If the CRO's Agreement is assumed under section 365 and employment approved under the terms of the Agreement and sections 327 and 328, the CRO's compensation would not be subject to further review under section 330 of the Bankruptcy Code.

<u>/s/ Gary M. Murphey</u>
Gary M. Murphey
Chief Restructuring Officer
Werthan Packaging, Inc.

20790455.5